**Affirmed and Majority and Dissenting Opinions filed September 22, 2020.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-19-00254-CR

---

**ZACHERY JAMES HERNANDEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 253rd District Court**
**Chambers County, Texas**
**Trial Court Cause No. 18426**

---

## D I S S E N T I N G   O P I N I O N

This case represents an abject failure to protect that which due process, *Brady*, and the Michael Morton Act purport to safeguard in our criminal justice system. Given the violations of these rights, the presence of fundamental errors by the trial court and the prosecution, the multiple remedies designed to correct such violations, and the consequences associated with judicial refusals to recognize such violations and grant remedies therefor, I emphatically dissent.

## I.    Facts

After Appellant was indicted, he made a formal request pursuant to the Michael Morton Act for (among other things) (1) "any documents [or] papers . . . of . . . any witness the prosecuting attorney may call as a witness," (2) "any . . . ledgers . . . or other tangible objects involved in the investigation and/or prosecution of [the] offense," (3) "any evidence which is exculpatory, impeachment, or mitigating document, item or information in the possession, custody, or control of the State, any law enforcement agency, or any State agency that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged," and (4) permission to inspect "any tangible property of any type seized during any arrest, search, [or] detainment of the defendant."[1]  Appellant subsequently filed a supplemental request (again, pursuant to the Michael Morton Act) requesting "inspection and/or the electronic duplication [or] copying" of "cell phone data", including Complainant's cell phone and the extraction of same performed by Sergeant Arredondo.[2]

At trial, two distinct versions of events were presented to the jury.  Appellant testified he was afraid when Complainant produced the gun and loaded it because (in relevant part) Complainant (1) received (but did not answer) multiple communications on his phone on the day in question, (2) explained that he owed someone some money and that was why he was not answering, and (3) attacked Appellant after he refused to loan Complainant money.  Conversely, Complainant testified (1) his phone "wasn't functioning", (2) that he could not make or receive phone calls or texts because he "didn't have any minutes on it", and (3) that he had

---

[1] CR 24-25.

[2] CR 52.

been without any minutes on his phone for two or three months. This testimony was invoked by the State during its closing argument.

The jury was tasked with determining which witness was more credible: either Complainant received communications via his cell phone on the day in question or he did not. Complainant testified at trial he still had the cell phone at his home and that, despite not having any minutes on his phone, he could use wi-fi when it was available and that he had used Facebook Messenger to make and receive phone calls. The State performed a partial cell phone extraction of Complainant's phone but failed to secure it. Even though it was properly requested by Appellant's counsel, it was unavailable to either the State or Appellant until the third day of trial. During the hearing on the motion in limine, the trial court stated, "Well . . . if there was a cell phone dump and it doesn't exist or it's gone and the State had it, well, you know, I mean, that's – that's – they're going to have to . . . suffer whatever the end result is."[3]

The State produced Investigator Jessica Johnson at trial to testify that she was the lead investigator, that Detective Sergeant Shane Arredondo was "the one that had the training and the connections with Baytown Police Department who had the software" to perform extractions of data from cell phones, and that she personally asked him to perform such an extraction on Complainant's phone. Investigator Johnson specifically testified that she wanted "to see if there were any incoming calls [to Complainant] as [Appellant] had stated" and that it took Sergeant Arredondo a little over a month to complete the extraction, to place it on a disc, and to return it (and Complainant's cell phone) to her. Investigator Johnson testified that "normally", the disc "would have been submitted into evidence."

Despite not having the disc or the information on it available to her at the

_____

[3] 2 RR 25: 23-25, 26: 1-4.

time of trial, Investigator Johnson testified that she "did not find anything relevant" in the extraction. When asked by the State if her report said "there's nothing on there [the CD]", Investigator Johnson answered, "Correct". When asked by Appellant's counsel whether she could testify "beyond a reasonable doubt, about the contents of the phone," she replied, "Not the full contents, no[.]" When asked specifically whether she remembered there was nothing relevant on the disc or whether she did not remember what was on it, she testified, "No, going off of memory, there was nothing relevant on it."

Investigator Johnson also testified that prior to leaving the employ of the Chambers County Sheriff's Department, she "went through everything that was . . . in or on [her] desk. Each file was packaged individually . . . the hard copy of the case file was labelled and submitted into evidence." She then put everything in an envelope and returned it to the sheriff's office. Despite Appellant's requests under the Michael Morton Act, Investigator Johnson did not examine the envelope she provided or the files therein prior to trial; there is no evidence in the record that she even attempted or requested permission to do so.

After Investigator Johnson testified, she found the disc (whether it was a copy or the original is unclear from the record) containing the cell phone extraction "stacked up in the stuff" in her garage. When she was originally subpoenaed, she (according to the State) "looked through a couple of boxes" but "couldn't remember because she gave the stuff over to CID [the Chambers County Sheriff's Office's Criminal Investigations Division] and turned all her stuff in over there." According to the Chambers County Sheriff's Office evidence custodian, cell phone extraction data would only come within her control "depend[ing] on if they [officers] put it in evidence or put it with the case file." In this case, the custodian

4

of records testified she "never had the cell phone data"[4] (thereby appearing to contradict Investigator Johnson's testimony). Upon being presented with the disc, Appellant's counsel told the trial court that he could not read the information thereon and that it needed to be reviewed by "somebody that understands all this much better than me"; he even specifically mentioned the expert he ultimately hired. Appellant's clear request for relief was denied.

Appellant also moved for a mistrial, alleged prosecutorial misconduct, and informed the court that the State's conduct violated the twice-issued subpoenas and the Michael Morton Act. The State's counsel initially contended that, "it just corroborates our witness' testimony [and] that's all it does "[5] and "[i]t [the disc] just shows calls made or not made."[6] Appellant's requests for a mistrial and a spoliation instruction were also denied.

The trial court declared: "I'm going to let Detective Arredondo go through it and see if he can find something that supports [Appellant's] position, and if he does, I'm going to let it in."[7] Despite Appellant's counsel's reluctance to rely solely upon the State's expert, the trial court seemed to believe that a reasonable approximation of truth could be reached via Sergeant Arredondo's representations[8]

---

[4] 4 RR 78: 16.

[5] 4 RR 8: 14-16.

[6] 4 RR 16: 9-10.

[7] 4 RR 22: 8-11.

[8] 4 RR 20: 13-18; 4 RR 22: 2-3.
DEFENSE COUNSEL: And, Judge, this is very unfamiliar for me, so I'm –

THE COURT: Well, I mean –

DEFENSE COUNSEL: – very nervous about –

alone and denied Appellant's request to consult an independent expert. Appellant's counsel also specifically complained that the trial court was denying Appellant an effective remedy.[9] After he examined the data on the disc, Sergeant

THE COURT: – you've got somebody with the sheriff's department that can tell you. . . . and you can get . . . Detective Arredondo to testify[.]

THE COURT: Right now, the data they're looking at doesn't support your client's position.

[9] *See* 4 RR 20: 25, 22-23.

DEFENSE COUNSEL: I just feel uncomfortable any time I'm looking at something that I'm very unfamiliar with and I'm only relying on the expert of the State to decipher it for me and not –

THE COURT: Well, it is what it is, you know. And I will tell you this, just for purposes of the record –

DEFENSE COUNSEL: Yes, sir.

THE COURT: – this is going to be admitted as an exhibit. It may or may not get in front of the jury, but it's going to be a part of this record, and for appellate purposes, you can send it to your expert, and you know, there may be some – you may find some smoking gun evidence, and it may come back, but I don't think it's there. It doesn't appear that it's there.

DEFENSE COUNSEL: Judge –

THE COURT: But you had the record –

DEFENSE COUNSEL: – I don't think I'm able to do that in this condensed time frame. I believe they stated in the beginning that the total amount of data that we pulled off of here is 7,000 pages. I don't think that I can effectively [analyze] that data, and I don't think it's an effective remedy to say "Well, if you want to appeal it if it doesn't go your way, then, yeah, it will become part of the record."

THE COURT: Right now, the data they're looking at doesn't support your

6

Arredondo conceded that he believed the extraction he performed and the disc he created *did not even have Complainant's call log*[10] despite (1) the fact that the calls were the precise piece of information Investigator Johnson sought and (2) the State's express representation concerning the contents of the disc.[11]

Presumably acknowledging that it was too long to read or even peruse during trial, the trial court (while characterizing its ruling as "very fair")[12] then allowed Appellant to enter the disc with 7,098 pages as an exhibit for us to review

---

client's position. Right now, the data does not support your client's position so – but I'm going to give you every bit of benefit of the doubt. Again, I'm not going to allow this disk in unless you want it in. Right now, it doesn't sound like you want it in, and I'm going to let Detective Arredondo go through it and see if he can find something that supports your position, and if he does, I'm going to let it in.

DEFENSE COUNSEL: Understood, Judge.

THE COURT: Okay.

[10] 4 RR 19: 5-12.

SERGEANT ARREDONDO: Well, it depends on the device. I can't say every device, but some of them, it does get the call log, even some of them deleted. From looking at this, it doesn't appear that it even – it might not even have grabbed the call log.

DEFENSE COUNSEL: It didn't grab the call log?

[11] 4 RR 16: 9-10.

THE STATE: It [the disc] just shows calls made or not made.

[12] 4 RR 24: 9-15.

THE COURT: But I'm giving the defense every benefit of the doubt. I think I'm being very fair in this case. He's able to look at it. If he wants to let it in, he can let it in. If he wants to keep it out – and right now, I can tell you, he's going to keep it out.

on appeal.[13] The trial court even told Appellant's counsel that if the disc was helpful, he would not be at any disadvantage.[14] No other curative steps (*e.g.*, an instruction to disregard) were even attempted by the trial court. During closing argument, the State specifically argued to the jury, "We know it wasn't people calling . . . [Complainant] testified that he had no minutes left."[15]

After Appellant was convicted, he moved for a new trial.[16] There, he alleged that the State's:

> [f]ailure to provide the Defendant with evidence of a data extraction of the Complainant's cell phone until the 3rd day of trial, February 27, 2019, is in violation of the constitutional and statutory rights of the Defendant under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article I, Section 9 of the Texas Constitution, and Texas Code of Criminal Procedure 39.14, and the 'Michael Morton' Act.[17]

Appellant specifically recounted (in a verified motion) how he had served a request for discovery and inspection of evidence and recited the State's representations that (1) the State "did not have a copy of the data extracted from [Complainant's] cell phone", (2) "there's nothing on it [the disc]", and (3) the disc had been lost. According to Appellant, the State subsequently sent his counsel an email stating Sergeant Arredondo "downloaded the phone onto a disc", turned the disc over to Investigator Johnson, and believed "there was not anything on the download that was relevant *to the offense*."

---

[13] 4 RR 22: 9-16.

[14] 4 RR 17: 4-10.

[15] 5 RR 60: 15-18.

[16] CR 104-110.

[17] Although Appellant's motion for new trial invokes the Sixth Amendment, his appeal mentions it only once in a section header. Under the circumstances, this is an insufficient presentment of the issue to warrant appellate review. *See* Tex. R. App. P. 38.1(i) (requiring "appropriate citations to authorities and to the record").

Appellant's motion for new trial was denied by operation of law and Appellant timely appealed. Appellant's brief states (without controverting argument by the State) that the information regarding the cell phone records was not received by Appellant's counsel until approximately eight months after the deadline for the motion for new trial and seven months after Appellant appealed the judgment.

## II. Standards of Review

Generally, we are obliged to review the denial of a motion for mistrial for an abuse of discretion and to uphold the trial court's ruling if it was within the zone of reasonable disagreement. *See Archie v. State*, 221 S.W.3d 695, 699-700 (Tex. Crim. App. 2007). Such review typically balances three factors: (1) the severity of the misconduct (prejudicial effect); (2) curative measures; and (3) the certainty of conviction or the punishment assessed absent the misconduct. *See Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (en banc); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (en banc).

These standards typically do not apply to analyses of alleged *Brady* violations. *See generally Brady v. Maryland*, 373 U.S. 83 (1963). Instead, "[t]here are three essential components of a *Brady* violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *Ex parte Temple*, No. WR-78,545-02, 2016 WL 6903758, at *2 (Tex. Crim. App. Nov. 23, 2016) (not designated for publication) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). "The Supreme Court has since held that the duty to disclose such evidence is applicable even though there has been no request by the accused[.]" *Id.* (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)); *see also Kyles v.*

9

*Whitley*, 514 U.S. 419, 434 (1995) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."). The remedy for a *Brady* violation is a new trial. *Ex parte Miles*, 359 S.W.3d 647, 664 (Tex. Crim. App. 2012).

Additionally, the conventional standards for a mistrial do not apply to violations under the Michael Morton Act. "The Michael Morton Act is essentially a state statutory extension of *Brady*, in which the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Hallman v. State*, 603 S.W.3d 178, 189 (Tex. App.—Fort Worth 2020, pet. filed) (observing that society wins not only when the guilty are convicted but also when criminal trials are fair and that our judicial system suffers when any accused is treated unfairly) (citing *Brady*, 373 U.S. at 87). As a state statutory extension of *Brady*, the baseline queries under the Michael Morton Act are: (1) did the State fail to disclose evidence; (2) was the withheld evidence favorable to the defendant; and (3) was the evidence material, *i.e.*, is there a reasonable probability that, had the evidence been disclosed, the trial's outcome would have been different. *See Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011).

Finally, we review cases for fundamental error even when it is unassigned. *See Carriera v. State*, 663 S.W.2d 1, 1 & n.1 (Tex. Crim. App. 1983) (en banc) (noting unassigned fundamental error concerning prosecutorial misconduct and reversing defendant's conviction); *McCauley v. Consol. Underwriters*, 304 S.W.2d 265, 266 (Tex. 1957) (per curiam) (holding that the supreme court had power to revise a lower-court judgment for unassigned fundamental error and recognizing

power of intermediate appellate courts to do same). Fundamental error is an error "calculated to injure the rights of the appellant to the extent that he has not had a fair and impartial trial.'" *Ross v. State*, 487 S.W.2d 744, 745 (Tex. Crim. App. 1972). As an intermediate appellate court, we are tasked with the duty to examine the record to discover fundamental errors, even without briefs. *See Fed. Deposit Ins. Corp. v. Roberson*, 603 S.W.2d 278, 279 (Tex. App.—Houston [14th Dist.] 1980, no writ) (citing *Ramsey v. Dunlop*, 205 S.W.2d 979, 982 (Tex. 1947)); *see also Bittle v. Serv. Mut. Ins. Co. of Tex.*, 103 S.W.2d 221, 221 (Tex. App.— Eastland 1937, no writ) (even without briefs, "[t]he approved practice is either to dismiss the appeal, or to examine the record to discover fundamental errors which may exist, and to affirm or reverse the case accordingly as such examination may require.") (citing *Haynes v. J. M. Radford Grocery Co.*, 14 S.W.2d 811 (Tex. [Comm'n Op.] 1929)). "Fundamental error survives today in those rare instances in which the record shows the court lacked jurisdiction or *that the public interest is directly and adversely affected as that interest is declared in the statutes or the Constitution of Texas*." *Britton v. Tex. Dep't of Criminal Justice*, 95 S.W.3d 676, 681 n.6 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (emphasis added) (quoting *Pirtle v. Gregory*, 629 S.W.2d 919, 919-20 (Tex. 1982) (per curiam)).

## III. Analysis

### A. Continuance

Appellant made an unwritten and unsworn request for continuance, properly requested a mistrial, and (even without an analysis of the merits) clearly alleged the State violated *Brady* and the Michael Morton Act; the sufficiency of his allegation is evidenced by the trial court's subjective awareness of the State's failures and the import thereof.[18] I would therefore join the Fort Worth Court of

---

[18] 4 RR 23: 8-22; 4 RR 11: 1-10.

Appeals and hold that when (as here) an oral motion for continuance in a criminal case is made and denied during trial on the same constitutional or statutory basis as a motion for mistrial, a defendant does not need to file a written, sworn motion for continuance in order to preserve his Article 39.14-based denial-of-mistrial complaint for our review. *See Hallman*, 603 S.W.3d at 189 (citing *Branum v. State*, 535 S.W.3d 217, 226-27 (Tex. App.—Fort Worth 2017, no pet.)). It is beyond dispute that, "The law does not require a futile act." *CA Partners v. Spears*, 274 S.W.3d 51, 68 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (citing *City of Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex. 1987) (stating the equitable maxim that "a court should not require the doing of a useless thing")); *see also Ohio v. Roberts*, 448 U.S. 56, 74 (1980) ("The law does not require the doing of a futile act."), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004); *Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) (en banc) (citing *Kinnamon v. State*, 791 S.W.2d 84 (Tex. Crim. App. 1990) (en banc)). Filing a written request for continuance based on violations of due process and statutory rights would be a futile act when those same violations are both (1) known to the trial court and (2) the basis for a separate written motion on which a mistrial is denied.

---

THE COURT: I mean, law enforcement's going to have to do a better job. They know – everybody knows – law enforcement knows Morton. They're going to have to tighten up their belts. They're going to have to start doing what their job is. It's not the DA's fault, but that doesn't make any difference. You've [sic] going to try the case, and Morton says that anything they have, you're responsible for, so, you know, law enforcement needs to step up. Morton means something. What we don't want is to another man like Michael Morton [to] spend years and years in prison for something he didn't do because something somebody hid something, and I'm not saying the State hid anything, but that's what it's supposed to prevent.

THE COURT: And, you know, that's what Morton's all about is getting that – it's not – you didn't hide it, but Officer Johnson should have produced it . . . . She found it last night. She could have found it six months ago, bottom line.

## B.    *Brady*

"There are three essential components of a *Brady* violation:  (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued."  *Ex parte Temple*, 2016 WL 6903758, at *2 (citing *Strickler*, 527 U.S. at 281-82).  Here, the State's concession that there were 7,098 pages of previously unproduced evidence during trial (but after Investigator Johnson's testimony) deprived Appellant of the opportunity to prove the evidence was favorable under *Brady*.  I conclude this deprivation constitutes an independent due process violation insofar as the State deprived Appellant of the opportunity to be heard at a meaningful time in a meaningful manner concerning the State's alleged *Brady* violation.  *See generally Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'") (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)); *see also Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004); *City of Houston v. Carlson*, 393 S.W.3d 350, 357 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *cf. Ward v. State*, 740 S.W.2d 794, 800 (Tex. Crim. App. 1987) (en banc) (citing *Armstrong*, 380 U.S. at 552).  I also conclude the State unjustifiably deprived Appellant of a fair and impartial trial via conduct that undermines confidence in the jury's verdict (*see Kyles*, 514 U.S. at 434), thereby evidencing extreme prejudice.

"When evaluating whether the materiality standard is satisfied, the strength of the exculpatory evidence is balanced against the evidence supporting conviction."  *Pena*, 353 S.W.3d at 812 (citing *Hampton v. State*, 86 S.W.3d 603, 613 (Tex. Crim. App. 2002)).  "The suppressed evidence is considered

collectively, rather than item-by-item." *Id.* (citing *Kyles*, 514 U.S. at 436). "[I]t is important to consider how disclosure could have affected defense preparation, with an awareness of the difficulty of post-trial reconstruction." *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 683 (1985)). Thus, "[s]ometimes, what appears to be a relatively inconsequential piece of potentially exculpatory evidence may take on added significance in light of other evidence at trial." *Id.* (quoting *Hampton*, 86 S.W.3d at 613). At the time Appellant requested both a mistrial and a new trial, he was unable to prove the evidence was material, favorable, or prejudicial because neither he nor anyone else appear to have had relevant knowledge concerning the data on the disc. Therefore, it would appear the State's misconduct prevented Appellant from proving his entitlement to relief under a strict appellate application of *Brady*.

## C. Michael Morton Act

### 1. Background

"In Texas, criminal defendants do not have a general right to discover evidence in the State's possession, but they have been granted limited discovery by article 39.14 of the Texas Code of Criminal Procedure." *Lindsey v. State*, 582 S.W.3d 810, 819 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (citing Tex. Code Crim. Proc. Ann. art. 39.14; *Washington v. State*, 856 S.W.2d 184, 187 (Tex. Crim. App. 1993) (en banc)). Article 39.14 ("the Michael Morton Act") "requires the State, upon request, to disclose to the defendant discoverable items that 'constitute or contain evidence material to any matter involved in the action' subject to certain statutory limitations." *Id.* (citing Tex. Code Crim. Proc. Ann. art. 39.14(a); *Glover v. State*, 496 S.W.3d 812, 815 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd)). "If the State has not received a request, it only has an affirmative duty to disclose 'any exculpatory, impeachment, or mitigating

14

document, item, or information' in its possession, custody, or control 'that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged.'" *Id.* at 819-20 (citing Tex. Code Crim. Proc. Ann. art. 39.14(h); *Glover*, 496 S.W.3d at 815). Here, such a request was made twice. *Cf. Pena*, 353 S.W.3d at 810 ("The State failed to disclose the audio portion when the videotape evidence was initially requested by defense counsel and again failed to disclose it after a second inquiry by the defense that addressed the lack of sound on the copy previously provided.").

"The Legislature passed the Michael Morton Act to make criminal prosecutions more transparent by ensuring that criminal defendants can review many of the State's discovery materials above and beyond those that are purely exculpatory." *Hallman*, 603 S.W.3d at 189 (citing *Love v. State*, 600 S.W.3d 460, 464 (Tex. App.—Fort Worth 2020, pet. filed)); *see also* Gerald S. Reamey, *The Truth Might Set You Free: How the Michael Morton Act Could Fundamentally Change Texas Criminal Discovery, or Not*, 48 Tex. Tech L. Rev. 893, 897 (2016) ("Prior to 2014, Texas discovery law . . . inhibited the ability of the criminally accused to obtain useful material from the [S]tate in a timely fashion."). "That is, the Act's *purpose* is to reduce the risk of wrongful conviction, which is high when criminal defendants 'are systematically denied information about the [S]tate's case until it is revealed at trial.'" *Hallman*, 603 S.W.3d at 189 (emphasis added) (citing Reamey, 48 Tex. Tech. L. Rev. at 899-900 (explaining that after serving almost 25 years of a life sentence, Morton was exonerated by evidence that had previously been undisclosed due to prosecutorial misconduct)). These purposes highlight the error of the State's unquestioning reliance upon police officers' representations that 7,098 pages of undisclosed and unexamined data contained "nothing relevant" and nothing "*relevant to the offense*."

Given my agreement with the Fort Worth Court of Appeals' recent jurisprudence concerning the Michael Morton Act (in *Hallman*), I quote it liberally:

> The recent changes to Article 39.14 create a general, continuous duty by the State to disclose before, during, or after trial any discovery evidence that tends to negate the defendant's guilt or to reduce the punishment he could receive. *Ex parte Martinez*, 560 S.W.3d 681, 702 (Tex. App.—San Antonio 2018, pet. ref'd); Cynthia E. Hujar Orr & Robert G. Rodery, *The Michael Morton Act: Minimizing Prosecutorial Misconduct*, 46 St. Mary's L.J. 407, 414 (2015) (stating that "for the first time, the prosecution is under a statutory duty to *continually* disclose exculpatory evidence").
>
> &ast;   &ast;   &ast;
>
> By instituting what amounts to a legislative "Open File" policy in advance of trial, the Michael Morton Act sets out a methodology to enhance the fairness of the trial process and to prevent wrongful convictions by giving the defense access to information the existence of which it might otherwise have to guess. *See generally Ex parte Temple*, No. WR-78,545-02, 2016 WL 6903758, at *3 n.20 (Tex. Crim. App. Nov. 23, 2016) (not designated for publication) (recognizing that "[t]he Michael Morton Act created a general, ongoing discovery duty of the State to disclose before, during, or after trial any evidence tending to negate the guilt of the defendant or reduce the punishment the defendant could receive"); *Young v. State*, 591 S.W.3d 579, 598 (Tex. App.—Austin 2019, pet. ref'd) ("When the [L]egislature passed the Michael Morton Act, it amended article 39.14 of the Code of Criminal Procedure to expand the availability and scope of discovery that must be produced by the State."); *Murray v. State*, No. 08-16-00185-CR, 2018 WL 1663882, at *4 (Tex. App.—El Paso Apr. 6, 2018, pet. ref'd) (mem. op., not designated for publication) ("The Michael Morton Act changed Texas law related to discovery in criminal cases in order to prevent wrongful convictions by ensuring defendants have access to the evidence in the State's possession so they may prepare a defense."). *But see Agurs*, 427 U.S. at 111, 96 S. Ct. at 2401 (rejecting suggestion that prosecutor has a constitutional duty to deliver his entire file to defense counsel).

"Favorable evidence" includes both exculpatory evidence and impeachment evidence. [*Ex parte*] *Chaney*, 563 S.W.3d [239, 266 (Tex. Crim. App. 2018)]; *see Strickler*, 527 U.S. at 280, 119 S. Ct. at 1948 ("We have since held . . . that the [*Brady*] duty encompasses impeachment evidence as well as exculpatory evidence."); *see also Kyles*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). Impeachment evidence is evidence that "disputes, disparages, denies, or contradicts other evidence." *Chaney*, 563 S.W.3d at 266. But materiality, a legal question that we review de novo, remains the linchpin of both Article 39.14(a) and *Brady*. *See* Tex. Code Crim. Proc. Ann. art. 39.14(a); *Chaney*, 563 S.W.3d at 264; *see also Strickler*, 527 U.S. at 282, 119 S. Ct. at 1948.

"To establish that requested evidence is material, a defendant must provide more than a possibility that it would help the defense or affect the trial." *Branum*, 535 S.W.3d at 224. That is, to be considered material and subject to mandatory disclosure under Article 39.14(a), such evidence must be indispensable to the State's case or must provide a reasonable probability that its production would result in a different outcome. *Id.* at 225; *see Ehrke v. State*, 459 S.W.3d 606, 611 (Tex. Crim. App. 2015) ("Evidence is material if its omission would create 'a reasonable doubt that did not otherwise exist . . . .'" (quoting *Agurs*, 427 U.S. at 112, 96 S. Ct. at 2402)); *see also Chaney*, 563 S.W.3d at 263-64, 266 (stating that false evidence is material when there is a "reasonable likelihood" that it would have affected the jury's judgment and that suppressed evidence is material if there is a reasonable probability that the trial's result would have been different if the suppressed evidence had been disclosed to the defense). "A reasonable probability is one sufficient to undermine confidence in the outcome of the trial." *Chaney*, 563 S.W.3d at 266; *see Wearry v. Cain*, __ U.S. __, 136 S. Ct. 1002, 1006, 194 L.Ed.2d 78 (2016) (stating, under *Brady*, that the defendant need not show that he "more likely than not" would have been acquitted had the new evidence been admitted but rather "only that the new evidence is sufficient to 'undermine confidence' in the verdict").

*Hallman*, 603 S.W.3d at 192-93.

### 2. Application

As an extension and expansion of *Brady*, the Michael Morton Act incorporates the holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 191 (citing *Brady*, 373 U.S. at 87). From this unambiguous baseline, "[f]avorable evidence is that which, if disclosed and used effectively, '*may* make the difference between conviction and acquittal.'" *Pena*, 353 S.W.3d at 811 (quoting *Bagley*, 473 U.S. at 676 (emphasis in original)); *see also Ehrke*, 459 S.W.3d at 611 ("Evidence is material if its omission would create 'a reasonable doubt that did not otherwise exist . . .'") (quoting *Agurs*, 427 U.S. at 112). Based on the State's failures, Appellant was deprived of the opportunity to timely prove whether the information on the phone or on the disc would have made any difference; Appellant even informed the trial court of said inability.[19] While I acknowledge that it is typically the criminal defendant's burden to establish favorability under *Brady*, I would hold the burden shifts to the State (to prove evidence is not favorable) where its violations of statutory or constitutional law precludes defendants from meeting their burden to establish materiality.

Additionally, the Michael Morton Act (unlike *Brady*) also applies when the evidence at issue is "indispensable to the State's case". *Carrera v. State*, 554 S.W.3d 800, 802 (Tex. App.—Waco 2018, no pet.) (citing *Branum*, 535 S.W.3d at 225); *see also Hallman*, 603 S.W.3d at 193; *Mundo v. State*, No. 08-19-00077-CR, 2020 WL 5105210, at *5 (Tex. App.—El Paso Aug. 31, 2020, no pet. h.) (not designated for publication); *In re State*, __ SW.3d __, 2020 WL 5105215, at *3 (Tex. App.—El Paso Aug. 31, 2020, orig. proceeding); *Taylor v. State*, No. 06-19-

---

[19] *See* n.9, *supra.*

18

00179-CR, 2020 WL 4643962, at \*10 (Tex. App.—Texarkana Aug. 12, 2020, no pet. h.) (mem. op., not designated for publication); and *Delafuente v. State*, No. 10-16-00376-CR, 2019 WL 5446028, at \*7 (Tex. App.—Waco Oct. 23, 2019, pet. ref'd) (mem. op., not designated for publication). Here, Investigator Johnson (in response to questioning from the State) corroborated Complainant's account concerning the absence of communications via Complainant's cell phone on the day in question by (1) implying she had reviewed an unproduced cell phone extraction, and (2) testifying she "did not find anything relevant" therein. The State relied upon Complainant's testimony during closing and used it (and Johnson's corroborating testimony) to discredit Appellant's version of events and to prove Complainant testified truthfully. Given the State's reliance on credibility, discrediting Appellant, and the absence of communications, the withheld data was indispensable to the State's case.

The impact of the State's presentment becomes clear when viewed through the lens of *Brady*, under which the duty to disclose arises when prosecutors or other members of the prosecuting team know of the investigation or have access to relevant information. *See Ex parte Mitchell*, 977 S.W.2d 575, 578 (Tex. Crim. App. 1997) (en banc); *Drew v. State*, 76 S.W.3d 436, 447-48 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). As an investigator (who characterized herself as "lead investigator"), Investigator Johnson was a member of the prosecution team. *See Ex parte Adams*, 768 S.W.2d 281, 292 (Tex. Crim. App. 1989) (en banc) (prosecution team "includes both investigative and prosecutorial personnel") (quoting *United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979) (citing *Schneider v. Estelle*, 552 F.2d 593, 595 (5th Cir. 1977))); *see also Smith v. State of Florida*, 410 F.2d 1349, 1351 (5th Cir. 1969). She also had access to the information at issue (*i.e.*, the phone and the disc) and testified on behalf of the

19

prosecution. Relatedly, Sergeant Arredondo was the investigator who performed the extraction, attended trial, and explained pieces of the unproduced report (and the methodology used to create it) to the trial court. Therefore, the prosecution was duty-bound under both *Brady* and the Michael Morton Act to learn about the contents of the phone, the extraction, and the disc from at least one of its investigating officers. *See Kyles*, 514 U.S. at 437-38 ("[T]the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.") (internal citations omitted); *see also Ex parte Castellano*, 863 S.W.2d 476, 480-81 (Tex. Crim. App. 1993) (en banc) ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government.") (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)); *Pena*, 353 S.W.3d at 810 ("The audio portion of the videotape was (or at least should have been) known to the State. Even if the prosecutor was not personally aware of the audio recording, the State is not relieved of its duty to disclose because 'the State' includes, in addition to the prosecutor, other lawyers and employees in his office and members of law enforcement connected to the investigation and prosecution of the case . . . . The videotape was created and preserved by law enforcement officers, agents of the State, who then maintained exclusive control over the evidence.").

The majority's conclusion that we should refrain from granting any relief renders the Legislature's enactment of the Michael Morton Act entirely toothless.

20

There is almost no meaningful value to a statute which requires the State to disclose impeachment or exculpatory evidence if the State's consistent failures to comply prevent Appellant from having access to information that could reveal materiality under *Brady* or the Michael Morton Act. The majority's nullification of a state law designed to bring (at least some) balance to our criminal justice system contravenes critical interests. *See Holloway v. State*, 780 S.W.2d 787, 793 (Tex. Crim. App. 1989) (en banc) ("Parity between participants is critical to prevent unfair and unjust outcomes that would be tainted by one side's superiority. The criminal defendant is less capable of coping with 'the system' than his or her governmental opponent.") (citing *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963)).

Because the Michael Morton Act is a state extension of *Brady*, it is similarly designed to "reduce the risk of wrongful conviction, which is high when criminal defendants 'are systematically denied information about the [S]tate's case until it is revealed at trial.'" *Hallman*, 603 S.W.3d at 189. Therefore, I would hold that the Michael Morton Act's extension of *Brady* includes the availability of relief to those who (like Appellant) have suffered governmental deprivations of their abilities to establish *Brady* violations through no fault of their own; otherwise, injustices like the one at bar present constitutional and statutory wrongs without any available remedy.

## IV.  Mistrial

"A mistrial is a device used to halt trial proceedings when an error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). Having discerned Appellant's apparent inability to prove materiality under *Brady* or the Michael Morton Act, I conclude it would be inequitable and unjust to ignore the

traditional test for granting a mistrial in Texas's criminal courts given that a mistrial was clearly requested when the State's misconduct became apparent. Therefore, we should balance (1) the severity of the misconduct (prejudicial effect); (2) curative measures; and (3) the certainty of conviction or the punishment assessed absent the misconduct. *Hawkins*, 135 S.W.3d at 77; *Mosley*, 983 S.W.2d at 259.

First, the severity of the misconduct (regardless of intent) is extremely high. Specifically, the State has failed to secure a crucial piece of evidence indispensable to both its case and Appellant's case despite an ongoing statutory duty to do so. Additionally, the State, Sergeant Arredondo, and Investigator Johnson each conveyed their respective beliefs to the trial court that there was nothing relevant to Appellant's defense in the data (despite the prosecutor's inability to examine this data prior to his factually incorrect representation to the court).

Second, the only measures taken by the trial court were (1) preventing the State from using the data and (2) admitting the disc into evidence for appellate review; neither of these measures could even begin to cure the State's misconduct or the palpable prejudice presented via Investigator Johnson's testimony based on previously undisclosed evidence. The trial court (despite recognizing a violation of law) did not grant a continuance and did not instruct the jury to disregard Investigator Johnson's testimony concerning the data on the disc. Instead, the trial court offered Appellant the assurances of Sergeant Arredondo, the same officer who failed to (1) notice he failed to download (at least) the one piece of information Investigator Johnson wanted despite knowing such failures were possible, (2) perform any other type of forensic examination despite knowing his methods were incomplete, and (3) preserve an original copy of the phone's data so

22

that it could be analyzed using any other method.[20]

Third, there can be zero certainty of conviction absent the State's misconduct precisely because it appears no one ever actually examined the data on (or not on) the disc for relevant evidence. This absence of certainty is magnified by the actual data, which appears to impeach Complainant and Investigator Johnson. *See generally* section V, *infra* ("Fundamental Error").

Like in *Hallman*, "[c]redibility was the key to this case". 603 S.W.3d at 183. The State's misconduct violated constitutional protections, duties, oaths, and statutes, particularly when viewed in light of its insistence on proceeding to verdict rather than investigating data it did not even receive until after Investigator Johnson testified. Even then, it is readily apparent that the State's prosecutors either (1) failed to review the 7,098 pages or (2) knew the contents thereof and did nothing; neither is permissible.

The majority finds assurances that the trial court "could have reasonably accepted [Investigator Johnson's] explanations and found that the untimely disclosure had been the result of negligence, not bad faith." This whitewashing of State-inflicted harm via an examination of the trial court's interpretation of the State's *mens rea* is wholly irrelevant to all questions presented (except arguably spoliation, which the majority does not address) and evidences a fundamental misunderstanding of designed protections against this precise harm. *See, e.g., Kyles*, 514 U.S. at 437-38; *Giglio*, 405 U.S. at 154; *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959); and *Castellano*, 863 S.W.2d at 480-81.

---

[20] While the impact of Sergeant Arredondo's failure to retain the original is clear from the lack of call logs, this impact is clarified by the expert affidavit Appellant filed in connection with this case. The majority will not consider this evidence because it was not in the record, but its absence is based on the State's failure to produce it until well after Appellant filed his motion for new trial.

## V.     Fundamental error

### A.     The nature of fundamental error

This case must be reversed because Appellant's conviction is predicated upon multiple fundamental errors. *See generally Robinson v. State*, 553 S.W.2d 371, 374 (Tex. Crim. App. 1977) (citing *Whitson v. State*, 495 S.W.2d 944 (Tex. Crim. App. 1973); *Mendoza v. State*, 491 S.W.2d 888 (Tex. Crim. App. 1973); and *Fennell v. State*, 424 S.W.2d 631 (Tex. Crim. App. 1968)).  "Fundamental error is an error 'calculated to injure the rights of the appellant to the extent that he has not had a fair and impartial trial.'"  *Robinson*, 553 S.W.2d at 374 (quoting *Ross*, 487 S.W.2d at 745); *see also Mendoza v. State*, 577 S.W.2d 240, 241 (Tex. Crim. App. [Panel Op.] 1979); *Owens v. State*, 385 S.W.2d 246, 247 (Tex. Crim. App. 1964); *Blake v. State*, 379 S.W.2d 899, 900 (Tex. Crim. App. 1964); *compare Fundamental Error*, Black's Law Dictionary (11th ed. 2019)  ("fundamental error [- see] *plain error* under ERROR (2)") *with Error*, Black's Law Dictionary (11th ed. 2019) ("plain error [-] An error that is so obvious and prejudicial that an appellate court should address it despite the parties' failure to raise a proper objection.  A plain error is often said to be so obvious and substantial that failure to correct it would infringe a party's due process rights and damage the integrity of the judicial process.  . . .  Also termed *fundamental error*.").  The nature and impact of such errors has been recognized and rectified by Texas's appellate courts since the early days of the Republic.  *See Jones v. Black*, 1 Tex. 527, 530 (1846) ("[I]f the foundation of the action has manifestly failed, we can not, without shocking the common sense of justice, allow a recovery to stand.") (quoting *Palmer v. Lorillard*, 16 Johns. 348, 348 (N.Y. 1819) (available at 1819 WL 1790)); *see also Ledbetter v. State*, 26 Tex. App. 22, 35, 9 S.W. 60 (1888); *Lacey v. State*, 22 Tex. App. 657, 659-60, 3 S.W. 343 (1887).  Comparable remedies for

comparable errors are recognized throughout the country. *See In re J.F.C.*, 96 S.W.3d 256, 287 n.1 (Tex. 2002) (Hankinson, J., dissenting) (collecting cases from 34 states and the District of Columbia).

## B. The public-interest-based standard

Here, the absence of an error affecting jurisdiction means we analyze fundamental error using the public-interest-based standard. *Pirtle*, 629 S.W.2d at 919-20; *Britton*, 95 S.W.3d at 681 n.6. After an appellate court determines that it will consider the unpreserved error, it conducts the next two steps of appellate review and "determines whether an error in fact occurred, and whether the error is harmful." *In re J.F.C.*, 96 S.W.3d at 292 (Hankinson, J., dissenting) (citing W. Wendell Hall, *Standards of Review in Civil Appeals*, 24 St. Mary's L.J. 1045, 1056 (1993); *In re C.O.S.*, 988 S.W.2d 760, 767 (Tex. 1999) (concluding that failure to give statutory admonishments, while fundamental error, was not harmful error requiring reversal); and *State v. Santana*, 444 S.W.2d 614, 615 (Tex. 1969) (holding that jury charge in juvenile case warranted fundamental-error review and analyzing whether charge violated due process), *vacated on other grounds*, 397 U.S. 596 (1970)). Such error is rare, and "implicated only when our most significant state public interests are at stake." *Id.* To qualify as "public-interest-based" fundamental error, the error at issue must be fairly "characterized the type of public interest that must be at stake as one 'declared in the statutes or Constitution of this state.'" *Id.* (citing *Ramsey*, 205 S.W.2d at 983); *see also Santana*, 444 S.W.2d at 615 (noting "the constitutional importance of this case to the public generally"). Evidence of such public interest relative to the Michael Morton Act is not hard to find.

## C. Statutory and constitutional declarations of public interests

"Official misconduct has been a factor in more than half of the nationally

reported exonerations since 1989 — nearly four score of which have occurred in Texas." *Hillman v. Nueces Cty.*, 579 S.W.3d 354, 365 (Tex. 2019) (Guzman, J., concurring). "Concealment of exculpatory evidence undermines the integrity of our criminal justice system, which is of vital importance to every one of us: 'Society wins not only when the guilty are convicted but when criminal trials are fair . . . the administration of justice suffers when any accused is treated unfairly.'" *Id.* (quoting *Brady*, 373 U.S. at 87). Justice Guzman proceeds to remind us that:

> The tragic story of Michael Morton and Debra Baker compelled the Legislature to take affirmative steps to prevent wrongful convictions due to prosecutorial misconduct. In the legislative session following Morton's exoneration, the Texas Legislature unanimously passed the Michael Morton Act. The Morton Act extends, but has not altered, prosecutors' longstanding obligation under *Brady v. Maryland* to disclose exculpatory evidence in the prosecution's possession. Before the Morton Act, prosecutors had a constitutional duty under *Brady* to disclose all evidence that might exonerate the defendant, but the defense had very limited pretrial discovery rights. Under the Morton Act, if the defense requests discovery, the prosecution is under a statutory duty to continually disclose exculpatory, mitigating, or impeachment evidence. The Act is an important legislative step towards ensuring *Brady* compliance and bolstering the integrity of the criminal justice system.

*Id.* (internal footnotes omitted).

Beyond the Michael Morton Act, I also conclude a separate (but related) public interest at stake is declared in the Texas Constitution. Specifically, Article I, section 19 of the Texas Constitution guarantees that:

> No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

Tex. Const. art. I, § 19; *see also* Tex. Code Crim. Proc. Ann. art. 1.04 (same). Appellant was deprived of his liberty and privileges in a manner that is expressly

26

contrary to a unanimously-passed statute designed to protect against this precise wrongdoing. *Compare* Senate Comm. on Criminal Justice, Bill Analysis, Tex. H.B. 510, 84th Leg., R.S. (2015) ("The 83rd Legislature's Michael Morton Act comprehensively overhauled the discovery process for Texas criminal cases. The Act reformed the Texas criminal discovery statute in the Code of Criminal Procedure to ensure more open and transparent discovery in all criminal cases and to improve the reliability of criminal convictions.") *with Duggan v. State*, 778 S.W.2d 465, 469 (Tex. Crim. App. 1989) (en banc) ("[F]alse evidence, left uncorrected, can mislead the factfinder, thereby misdirecting the due course of law and diverting due process from its intended progression toward a just and fair trial."); *see also* Tex. Code Crim Proc. Ann. art. 1.03 (4)-(5) ("This Code . . . seeks . . . [t]o bring to the investigation of each offense on the trial all the evidence tending to produce conviction or acquittal" [and] "[t]o insure a fair and impartial trial[.]"). *Cf.* Tex. Civ. Prac. & Rem. Code Ann. ch. 103 (entitled "Compensation to Persons Wrongfully Imprisoned").

Given the guarantees of the Texas Constitution, the nature of the Michael Morton Act, and the repeated wrongs the act was unanimously approved to prevent (then remedy), the public interests at issue herein are sufficiently "declared in the statutes or Constitution of this state" and thereby warrant fundamental error review. *Ramsey*, 205 S.W.2d at 983; *Roberson*, 603 S.W.2d at 279. Without rectification, the majority's position ignores government misconduct or gross negligence, condones comparable conduct, and fails to convey to Chambers County (and anyone else who is listening) that their conduct and procedures are unacceptable under the laws of this state, prosecutorial ethics, and constitutional requirements. *Duggan*, 778 S.W.2d at 468 ("The duty to correct known false evidence is not only a prosecutorial ethic, but a constitutional requirement.")

(citing *Miller v. Pate*, 386 U.S. 1 (1967); *Alcorta v. Texas*, 355 U.S. 28 (1957); *Pyle v. Kansas*, 317 U.S. 213 (1942); and *Mooney*, 294 U.S. 103 (1935)).

## D.      Application of law to the facts

The record establishes that the trial court knew what the Michael Morton Act required *and* that the State had violated it;[21] the trial court even understood the importance of the evidence potentially present on the disc.[22]  Nonetheless, the trial court permitted the prosecution to proceed despite Appellant's request to consult an expert.  The trial court's decisions disregarded Appellant's rights to (*inter alia*) impeachment evidence, exculpatory evidence, governmental compliance with *Brady*, governmental compliance with the Michael Morton Act, the opportunity to make his case for a spoliation instruction, and meaningfully confront a corroborating witness.  Instead of complying with Appellant's timely and repeated requests for information, the State presented him with *7,098 pages* of data *after* Investigator Johnson testified.   Instead of granting a mistrial (or even a continuance), the trial court forced Appellant to rely upon analyses from Sergeant Arredondo on behalf of the State.  Viewed independently or collectively, these trial court decisions were calculated to injure Appellant's rights and to deprive him of a fair and impartial trial; they also succeeded.  These deprivations strike at the very heart of our adversarial system.

---

[21] *See* n.18, *supra.*

[22] 4 RR 18: 14-18.
THE COURT:  Your contention, which your client hasn't testified, but your contention – what you've stated to the jury is that a bunch of incoming calls [were] made that he refused to accept.

DEFENSE COUNSEL: Correct.

28

## 1. The trial court's rulings undermine the integrity of our adversarial criminal justice system

"[W]e have placed our confidence in the adversary system, entrusting to it the primary responsibility for developing relevant facts on which a determination of guilt or innocence can be made." *United States v. Nobles*, 422 U.S. 225, 230 (1975) (citing *United States v. Nixon*, 418 U.S. 683, 709 (1974); *Williams v. Florida*, 399 U.S. 78, 82 (1970); and *Elkins v. United States*, 364 U.S. 206, 234 (1960) (Frankfurter, J., dissenting)). This system "is central to the administration of criminal justice." *Holloway*, 780 S.W.2d at 793. "Due process and those individual rights that are fundamental to our quality of life co-exist with, and at times override, the truth-finding function." *Morrison v. State*, 845 S.W.2d 882, 884 (Tex. Crim. App. 1992) (en banc). In *Nixon*, Chief Justice Burger made clear that:

> The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.

*Nixon*, 418 U.S. at 709.

Forcing Appellant to rely on Sergeant Arredondo to decipher his own incomplete investigation and to analyze evidence with a sufficiently informed definition of the terms "relevance" or "materiality" cannot be reconciled with any guiding principles concerning our adversary system and was calculated to injure Appellant's rights while denying him a fair and impartial trial. *Cf. McWilliams v. Dunn*, 137 S. Ct. 1790, 1803 (2017) (Alito, J., dissenting). ("While it is possible

29

for a *neutral* expert to provide these services, in our adversary system they are customarily performed by an expert working exclusively for one of the parties.") (emphasis added). The egregiousness of being forced to rely upon Sergeant Arredondo is further evidenced by his contention (to the State) that there was nothing "relevant *to the offense*" in the data; based thereon, it is clear he was not even analyzing the information (if at all) for evidence relevant to Appellant's defense.

Continuing to add to these nesting fundamental errors, the trial court knew Appellant did not have sufficient time to review the 7,098 pages. First, Appellant's counsel told the court:

> I believe they stated in the beginning that the total amount of data that we pulled off of here is 7,000 pages. I don't think that I can effectively [analyze] that data, and I don't think it's an effective remedy to say "Well, if you want to appeal it if it doesn't go your way, then, yeah, it will become part of the record."

Second, no reasonable jurist could expect any non-expert to review and understand 7,098 pages of cell phone extraction data or the relevance of same in less than 24 hours. Therefore, the trial court's actions fundamentally undermine the integrity of the proceeding.

### 2. The trial court's errors deprived Appellant of the opportunity to prove his entitlement to a spoliation instruction

These fundamental errors are further compounded by Appellant's inability to prove his entitlement to his requested spoliation instruction. Spoliation is "[t]he intentional destruction, mutilation, alteration, *or concealment* of evidence, usu[ally] a document." *Spoliation*, Black's Law Dictionary (11th ed. 2019) (emphasis added); *see also Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 25 (Tex. 2014) (spoliation can apply to a party's "failure to produce relevant

30

evidence"). At trial, Appellant argued that because the State's destruction or concealment of evidence irreparably prevented him from meaningfully presenting his claim or defense, a spoliation instruction should issue. *See Brookshire Bros., Ltd.*, 438 S.W.3d at 25 ("On rare occasions, a situation may arise in which a party's negligent breach of its duty to reasonably preserve evidence irreparably prevents the nonspoliating party from having any meaningful opportunity to present a claim or defense.") (citing *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 721 (Tex. 2003) (recognizing that "the loss or destruction of evidence may seriously impair a party's ability to present its case")). In such circumstances, "the destruction or loss of the evidence, regardless of motive, could completely subvert the factfinder's ability to ascertain the truth" and "undermine the truth-seeking function of the judicial system and the adjudicatory process." *Id.* at 16-17 (quoting Justice Rebecca Simmons and Michael J. Ritter, *Texas's Spoliation "Presumption"*, 43 St. Mary's L.J. 691, 701 (2012) and *Trevino v. Ortega*, 969 S.W.2d 950, 954 (Tex. 1998) (Baker, J., concurring) (observing that "[e]vidence spoliation is a serious problem that can have a devastating effect on the administration of justice")). Appellant's request for a spoliation instruction was also denied.

"The Supreme Court has recognized the State in some instances has a duty to preserve evidence in its possession and the violation of this duty may rise to the level of a due process violation under the Fourteenth Amendment." *Zapata v. State*, 449 S.W.3d 220, 228-29 (Tex. App.—San Antonio 2014, no pet.) (citing *Illinois v. Fisher*, 540 U.S. 544 (2004) (per curiam); *Arizona v. Youngblood*, 488 U.S. 51 (1988); and *California v. Trombetta*, 467 U.S. 479 (1984)). Under the spoliation framework, courts analyzing due process violations must distinguish between two types of evidence. "If the State fails to preserve material, exculpatory

31

evidence, then the State has committed a due process violation." *Id.* (citing *Youngblood*, 488 U.S. at 57; and *Brady*, 373 U.S. at 83). "However, if the State merely fails to preserve 'potentially useful evidence,' the defendant must show the State did so in bad-faith in order to show a violation of due process." *Id.* (citing *Youngblood*, 488 U.S. at 58; and *Ex parte Napper*, 322 S.W.3d 202, 229 (Tex. Crim. App. 2010)). It is noteworthy that the Texas Supreme Court has approvingly cited the Fourth Circuit Court of Appeals for the proposition that severe sanctions (including dismissal) can be warranted where a party's spoliation of evidence creates "extraordinary" prejudice or deprives it of "the only available evidence from which it could develop its defenses." *Brookshire Bros., Ltd.*, 438 S.W.3d at 25 (citing *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 593-94 (4th Cir. 2001)).

Accepting the trial court's assessment that the State did not act in bad faith, Appellant was still unable to prove his entitlement to a spoliation instruction under the Supreme Court's due process tests for the same reasons he could not prove the State committed a *Brady* violation, *i.e.*, he could prove neither materiality nor "favorableness" of the evidence. However, we have been presented with a record which demonstrates (1) the State failed to "reasonably preserve evidence" in a manner that comports with the Michael Morton Act, (2) the State made no effort to rectify the prejudice it created, and (3) that said failure irreparably prevented Appellant from (at least) receiving a fair trial worthy of confidence. *See Kyles*, 514 U.S. at 434 ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."). The trial court's failure to remedy the State's misconduct therefore constituted fundamental error.

### 3. The data on the disc

Turning to the 7,098 pages, we know from Appellant's brief and the record that a key component of his defense was his contention that Complainant had received communications throughout the day from someone to whom he owed a significant sum of money. In my opinion, the contents of the withheld cell phone extraction records is further evidence that the trial court's actions were calculated to deprive Appellant of a fair and impartial trial, particularly because it appears no one has actually examined those records. Specifically, the cell phone extraction data contains approximately 140 text messages from the two months preceding the incident at bar, more than 20 of which show Complainant's ongoing financial difficulties and (some of) the consequences of not resolving them, *e.g.*, the apparent issuance of a warrant for Complainant's arrest, his inability to secure funds to pay fines associated therewith, and the possibility of going to jail for years as a result.[23]

### 4. The impact of the data's absence on Appellant's trial

These text messages reveal several crucial pieces of information, none of which were made available to Appellant before trial despite requests, constitutional guarantees, statutory protections, and ethical duties. First, Complainant was clearly not telling the truth when he testified that he had been without service on his phone for two or three months prior to August 20, 2015; this is precisely the type of impeachment evidence the Michael Morton Act was intended to provide. Second, these text messages reveal a substantial number of Complainant's written communications in the six weeks before he was shot were related to his significant financial issues concerning cars, phones, parents, and even an active warrant

---

[23] *See* State's Exhibit 73 at pgs. 6910, 6914-6917; *see also id.* at pgs. 6986, 6960-62.

(potentially with an accompanying threat of "years" worth of jail time);[24] such texts are directly relevant to Appellant's version of the story and would have permitted his counsel to meaningfully explore such issues on cross-examination and to call multiple witnesses capable of proving the nature of Complainant's financial difficulties.

As if the content of these texts was somehow insufficient to trigger guaranteed protections or remedies designed to remedy inevitable violations of such protections, the extraction also reveals Complainant contacted "Annie" on July 15 at 9:09:09 p.m., "Mom" on July 25, 2015 at 8:20:11 a.m.,[25] and "Trent" at 12:31:45 a.m. on the morning he was shot (despite (1) his testimony that he did not have service for two or three months before that same day and (2) the State's express reliance on that testimony).[26]   No one can seriously question that impeaching Complainant concerning his professed inability to communicate with his cell phone after July 13 via his own mother (or impeaching him and his mother via the extracted report) could conceivably raise reasonable doubt in the mind of a reasonable juror, particularly concerning Complainant's credibility.

Even without examining the data, any reasonable attorney would know that a reasonably performed extraction of such data would reveal (at least) that (1) the phone received calls at a particular time, (2) the phone did not receive calls at a

---

[24] The record also reveals (1) Appellant requested that the trial court order the State to disclose records pertaining to its witnesses revealing "offenses pending between the date of this offense and trial, which might have a bearing on the witness's motive to testify . . ." (CR 34) and (2) the trial court granted said order.  CR 38.  Despite said order, the record appears to be silent as to whether the existence of said warrant or the nature of Complainant's apparently alleged offense was disclosed to Appellant before trial.

[25] 6 RR, State's Exhibit No. 73, at pg. 6941.

[26] 5 RR 60: 15-18.

THE STATE:  We know it wasn't people calling . . . [Complainant] testified that he had no minutes left.

particular time, (3) relevant data had been deleted, or (4) there was a problem with the extraction. Here, Sergeant Arredondo gave the State actual notice that the call log was not downloaded; as a result, the prosecution failed in its duty to recognize the misleading nature of Investigator Johnson's testimony when she testified that the cell phone extraction contained no relevant information concerning Complainant's use of his cell phone. *See Duggan*, 778 S.W.2d at 468-69 ("It does not matter whether the prosecutor actually knows that the evidence is false; it is enough that he or she should have recognized the misleading nature of the evidence.") (citing *Agurs*, 427 U.S. at 103; *Giglio*, 405 U.S. at 154 ("whether the nondisclosure [is] a result of negligence or design, it is the responsibility of the prosecutor.")); *see also Napue*, 360 U.S. at 269-70 ("That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.") (quoting *People v. Savvides*, 136 N.E.2d 853, 854-55 (N.Y. 1956)); *Harris v. State*, 818 S.W.2d 231, 233 (Tex. App.—San Antonio 1991, no pet.) ("[K]nowledge of the police will be imputed to the prosecutor."); *cf. Zule v. State*, 802 S.W.2d 28, 33 (Tex. App.—Corpus Christi 1990, pet. ref'd) ("The State is responsible for disclosing favorable evidence known by its agents, including police officers, even if the particular evidence is not known to the prosecuting attorney.").

"When evaluating whether the materiality standard is satisfied, the strength of the exculpatory evidence is balanced against the evidence supporting conviction." *Pena*, 353 S.W.3d at 812 (citing *Hampton*, 86 S.W.3d at 613). "The suppressed evidence is considered collectively, rather than item-by-item." *Id.* (citing *Kyles*, 514 U.S. at 436). "[I]t is important to consider how disclosure could have affected defense preparation, with an awareness of the difficulty of post-trial reconstruction." *Id.* (citing *Bagley*, 473 U.S. at 683). Thus, "[s]ometimes, what

35

appears to be a relatively inconsequential piece of potentially exculpatory evidence may take on added significance in light of other evidence at trial." *Id.* (quoting *Hampton*, 86 S.W.3d at 613).

The withheld extraction undermines confidence in the outcome of the trial. *See Pena*, 353 S.W.3d at 812-13. Here, Complainant and Appellant each had a story; part of Complainant's story was false and part of Investigator Johnson's testimony tending to corroborate said falsity was also false. Without these, the jury would have weighed Appellant's story against Complainant's story without an inaccurate State-sponsored thumb on the scale. *Cf. Taylor v. Illinois*, 484 U.S. 400, 412 n.16 (1988) (The "growth of discovery devices is a salutary development which, by increasing the evidence available to both parties, enhances the fairness of the adversary system.") (citing *Wardius v. Oregon*, 412 U.S. 470, 473-474 (1973)). If Appellant had been provided with the phone or the extraction, it would have foreseeably and materially affected his defense preparations. This is particularly important given the State's opening emphasis on witness credibility and facts not matching up in light of the evidence[27] and closing insistence that whatever was happening with Complainant's phone, "We know it wasn't people calling . . . [Complainant] testified that he had no minutes left"[28] (despite the fact that Sergeant Arredondo neither downloaded the call logs nor preserved the original data so that the call logs could be analyzed by a competent professional

---

[27] 2 RR 136: 7-14

THE STATE: I want you to also keep in mind that when you hear the testimony, think about how you determine if somebody has credibility for what they're saying. I want you to take note, maybe just a mental note, but I want you to take note, any time their story changes or any detail even where it just doesn't match up, and I want you to look at their story and want you to look at the evidence and I want you to ask which story makes sense.

[28] 5 RR 60: 15-18.

36

capable of doing so).

After examining the contents of the 7,098 pages dumped on Appellant during trial, I would conclude the State's ongoing refusal to even examine the documents used to support its case improperly denied Appellant the opportunity to meaningfully present his case, to be heard at a meaningful time in a meaningful manner on dispositive issues, and to a fair and impartial trial worthy of confidence. Despite knowing Complainant still has the cell phone in his possession *and* knowing the performed extraction was incomplete, we have been presented with no evidence that the State has made any effort to preserve (much less discern) the truth of what relevant, exculpatory, or impeachment evidence is on Complainant's cell phone. This evidences the State's ongoing violation of a statutorily-imposed duty. *See Hallman*, 603 S.W.3d at 191 ("The recent changes to Article 39.14 create a general, continuous duty by the State to disclose before, during, or after trial any discovery evidence that tends to negate the defendant's guilt or to reduce the punishment he could receive.") (citing *Ex parte Martinez*, 560 S.W.3d 681, 702 (Tex. App.—San Antonio 2018, pet. ref'd); Cynthia E. Hujar Orr & Robert G. Rodery, *The Michael Morton Act: Minimizing Prosecutorial Misconduct*, 46 St. Mary's L.J. 407, 414 (2015) (stating that "for the first time, the prosecution is under a statutory duty to *continually* disclose exculpatory evidence")); *see also Ex parte Temple*, 2016 WL 6903758, at *3 n.20 ("The Michael Morton Act created a general, ongoing discovery duty of the State to disclose before, during, or after trial any evidence tending to negate the guilt of the defendant or reduce the punishment the defendant could receive."); *compare* Tex. Code Crim. Proc. Ann. art. 39.14(h) ("Notwithstanding any other provision of this article, the state shall disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of the state that tends to negate

the guilt of the defendant or would tend to reduce the punishment for the offense charged."); *with id* art. 39.14(k) ("If at any time before, during, or after trial the state discovers any additional document, item, or information required to be disclosed under Subsection (h), the state shall promptly disclose the existence of the document, item, or information to the defendant or the court.").

## VI. New trial

Finally, we review the trial court's ruling on a motion for new trial for an abuse of discretion. *State v. Thomas*, 428 S.W.3d 99, 103 (Tex. Crim. App. 2014). This analysis examines whether the trial court acted without reference to any guiding rules or principles. *Id.* Given the numerous violations, abuses, harms, and State-sponsored misrepresentations outlined above, I cannot (after considerable effort) ascertain what rules or principles the trial court was even attempting to follow when it acknowledged the Michael Morton Act demanded more of the State yet permitted the State to proceed without even attempting to provide Appellant with a remedy or a meaningful opportunity to review inexcusably withheld evidence that it knew was more than 7,000 pages long.[29]

It is inconceivable to me that the jury could have been unaffected by either (1) the State's presentment of a critical corroborating fact concerning the existence of relevant records via Investigator Johnson, or (2) Appellant's inability to impeach or even question the credibility of Complainant or Investigator Johnson based on the State's failures. The trial court's refusals to provide any remedy evidences an implicit bias in favor of the State and law enforcement insofar as it accepted the prosecutor's representations regarding what was on the disc while

---

[29] 4 RR 21: 19-22 (Appellant's counsel informing the court that he was told (because he had not even seen it yet) that the data in question was 7,000 pages).

also accepting his representation that he did not even have access to the underlying data.

## VII. Conclusion

"While Justice may be blind, she is not naïve[.]" *Francis v. State*, 425 S.W.3d 554, 559 (Tex. App.—Fort Worth 2014, no pet). When presented with fundamental error and facts which evidence violations of clearly established constitutional rights, United States Supreme Court precedent, and state law designed to prevent and rectify such violations, we cannot justifiably close our eyes to the resulting injustices. *See Anderson v. Cox*, 45 S.W.2d 339, 339 (Tex. App.—Eastland 1931, no writ) ("[W]e would not meet the requirements of justice were we to close our eyes to fundamental error when found."). Even if Appellant is guilty of a crime, he cannot be legitimately deprived of his fundamental right to evidence which (1) challenged Complainant's veracity, (2) challenged Investigator Johnson's knowledge, and (3) tended to corroborate his story concerning Complainant's motives (particularly given his timely requests for the device, data from the device, time, the opportunity to consult with an expert, a mistrial, and a new trial). *See* Tex. Const., art. I, § 19; *see also* Tex. Code Crim. Proc. Ann. art. 1.04.

Both *Brady* and the Michael Morton Act are aimed at remedying the intermittent absence of fair trials (whether by accident or design). Nevertheless, the State's misconduct paired with the trial court's errors improperly prevented Appellant from (1) having the information necessary to establish materiality, and (2) proving his entitlement to multiple forms of relief. This deprivation of a fair and impartial trial constitutes harmful fundamental error that "undermine[s] the truth-seeking function of the judicial system and the adjudicatory process." *Brookshire Bros., Ltd.*, 438 S.W.3d at 16-17.

The State made multiple independent failures to properly extract the data in question, to retain it, to provide it to either the evidence custodian or prosecutor, and to provide it to Appellant's counsel. The magnitude of these fundamental errors is amplified by the fact that the trial court's rulings simultaneously deprived Appellant of both the ability to effectively cross-examine and confront the State's corroborating witness and a meaningful opportunity to be heard concerning his complaints under *Brady*, the Michael Morton Act, and principles of spoliation.

These are the precise harms which the Michael Morton Act was designed to prevent and the inequitable outcome herein could be replicated (accidentally or deliberately) by prosecutors absent judicial intervention. Therefore, I dissent.

/s/    Meagan Hassan
Justice

Panel consists of Justices Christopher, Jewell, and Hassan (Christopher, J., majority).
Publish — Tex. R. App. P. 47.2(b).